[No. 52454-8. En Banc. November 6, 1986.]

RONALD NOEL WATSON, ET AL, *Respondents*, v.
CLYDE HOCKETT, ET AL, *Petitioners*.

*Williams, Kastner & Gibbs,* by *William H. Mays* and
*Eileen M. Lawrence,* for petitioners.

*Richards & Kinerk, Dwayne A. Richards,* and *Laurie A.
Kinerk,* for respondents.

ANDERSEN, J.—

FACTS OF CASE

Dr. Clyde Hockett, his marital community and Family Medicine Yakima Valley (the Clinic) where Dr. Hockett practiced are the defendants in this medical malpractice action. Ronald N. Watson (the patient) and his wife are the plaintiffs. At issue is whether the trial court erred in not giving certain of the defendant doctor's proposed instructions to the jury. It is conceded that if the verdict stands against the doctor, it stands as against all of the defendants.[1]

Dr. Hockett was a medical doctor at the Clinic at all times relevant to this action. He is a specialist in family practice. He treated the patient for chronic headaches in October 1979, then did not see him again for somewhat over 6 months.

On April 25, 1980, the patient experienced severe stomach cramps and rectal pain. He made an appointment at the Clinic and there saw Dr. Hockett on April 29.

Dr. Hockett's examination of the patient revealed a small area of inflammation and discharge about the patient's rectum and a small hemorrhoid with no evidence of fissure, mass or internal hemorrhoid. He concluded that the patient was suffering from constipation caused by taking excessive amounts of headache medication containing codeine. Dr. Hockett prescribed treatment which he believed would correct the problem and testified that he told the patient to return to the Clinic for followup in a week, and to call if the problem worsened.

In the week between this April 29 examination and the following May 6, when the patient went to the hospital, the patient and his wife phoned Dr. Hockett several times concerning the patient's continuing problems and rectal pain.

---

[1]See trial court's instruction 5 which was not excepted to or appealed from.

At trial, there was flatly conflicting testimony as to the content of these phone conversations. According to the patient, Dr. Hockett ignored his complaints and refused to either see him or refer him to the hospital emergency room. According to Dr. Hockett, the patient refused to come in and see him and did not follow his instructions to this effect.

On May 6, 1980, the patient was admitted to the emergency room at Yakima Valley Memorial Hospital and was diagnosed by the doctors there as having a very large rectal abscess. He underwent surgery to have the abscess drained, but the abscess had already caused extensive damage. The patient testified that as a result he now suffers urinary and rectal incontinence, as well as sexual dysfunctioning.

The case was tried to a jury which found that Dr. Hockett and the patient were both negligent (73 percent and 27 percent respectively) and assessed damages totaling $99,000. Judgment for $72,270 (the total damages less a $26,730 offset for the patient's contributory negligence) was thereupon entered in favor of the plaintiffs' against the defendants. Defendants' motion for a new trial was denied.

Dr. Hockett and the Clinic appealed. The Court of Appeals affirmed the trial court's judgment.[2] The case comes before this court on a petition for review brought by the doctor and the Clinic asking this court to reverse the Court of Appeals on the basis of three of the defendant doctor's proposed jury instructions which were not given.

We are presented with two issues.

## ISSUES

ISSUE ONE. Were the defendant's proposed jury instructions on the following legal principles proper?

1. A doctor does not guarantee a good medical result.

2. A poor medical result is not, in itself, evidence of any wrongdoing by the doctor.

3. A doctor who otherwise follows the appropriate pro-

---

[2]*Watson v. Hockett*, 42 Wn. App. 549, 712 P.2d 855 (1986).

fessional standards should not be found negligent because he or she makes an error of judgment.

ISSUE TWO. Did the trial court commit reversible error by not giving these proposed instructions to the jury?

## DECISION

ISSUE ONE.

CONCLUSION. The proposed instructions on the three principles of law in question were all approved in a unanimous opinion of this court and properly state the law. In the light of modern jury instruction practice, however, which is aimed at avoiding slanted or argumentative instructions, these instructions should be phrased differently anytime they are used in the future.

It is helpful to put this matter into perspective at the outset.

First, then, some general observations.

█ The law of medical malpractice is for the most part based on theories of fault based liability. Absent a contract promising the patient a particular result,[3] a doctor will not normally be held liable under a fault based system simply because the patient suffered a bad result.[4] It must, rather, be shown that the doctor's conduct fell below a level that society considers acceptable.[5] Even under the negligence doctrine of res ipsa loquitur, there must be evidence from which negligence can at least be inferred.[6] In the absence of proof that the doctor failed to exercise the required level of skill and care, the patient suing the doctor should not

[3]*See Brooks v. Herd,* 144 Wash. 173, 176, 257 P. 238 (1927).

[4]*Derr v. Bonney,* 38 Wn.2d 678, 681, 231 P.2d 637, 54 A.L.R.2d 193 (1951); *Crouch v. Wyckoff,* 6 Wn.2d 273, 282, 107 P.2d 339 (1940).

[5]*Harris v. Groth,* 99 Wn.2d 438, 445, 663 P.2d 113 (1983).

[6]*Stone v. Sisters of Charity,* 2 Wn. App. 607, 612, 469 P.2d 229 (1970); *see Pederson v. Dumouchel,* 72 Wn.2d 73, 81–82, 431 P.2d 973, 31 A.L.R.3d 1100 (1967).

prevail;[7] the mere fact that an injury was therapy produced or that there was an unfavorable or "bad" result from the therapy, however, does not necessarily mean that there was negligence or other wrongful conduct.[8]

The most critical element of most medical malpractice claims based on negligence, and that which has stirred the most debate in our judicial forums and legislative halls, is the standard of care owed by the doctor to his or her patient.

For many years in this state, the standard of care was "'the standard and degree of care and skill expected of the *average* medical . . . practitioner, in the class to which defendant belongs, acting in the same or similar circumstances.'"[9] In a case tried under that standard of care, *Miller v. Kennedy,* both the Court of Appeals[10] and this court[11] unanimously held that the trial court did not err when it gave instructions to the effect of those proposed by the doctor in the present case. The last appeal in the series of appeals in that case was *Miller v. Kennedy,* 91 Wn.2d 155, 588 P.2d 734 (1978), and that being the final word on the case, it is to that decision which we particularly direct our attention and quote, and it is that decision which we hereinafter refer to as *"Miller"*.

The "no guarantee" and "bad result" instructions were contained in separate sentences of the following single jury instruction given in *Miller*:

"You are instructed that a physician employed to treat or administer to a patient does not and cannot insure or in

[7]*See Versteeg v. Mowery,* 72 Wn.2d 754, 755, 435 P.2d 540 (1967); *Richison v. Nunn,* 57 Wn.2d 1, 4–5, 340 P.2d 793 (1959); *cert. denied,* 364 U.S. 816 (1960).

[8]*Miller v. Kennedy,* 91 Wn.2d 155, 160, 588 P.2d 734 (1978).

[9]*Harris,* at 445. *See, e.g., Pederson,* at 79; *Versteeg,* at 758.

[10]*Miller v. Kennedy,* 11 Wn. App. 272, 522 P.2d 852 (1974).

[11]*Miller v. Kennedy,* 85 Wn.2d 151, 530 P.2d 334 (1975); *Miller v. Kennedy,* 91 Wn.2d 155, 588 P.2d 734 (1978).

any sense guarantee a satisfactory result, nor is the physician responsible for unsatisfactory results of his treatment or care unless his own lack of professional knowledge and skill or his negligent failure to exercise it is the proximate cause of such result. The fact in a particular case that complications result is not in itself any evidence that the treatment was improper or that the physician failed to exercise the professional knowledge and skill necessary to proper professional practice, nor is it any evidence that the doctor failed to exercise his skill with reasonable care."

91 Wn.2d at 159 n.3.

In *Miller,* the giving of these instructions was unanimously held by this court not to have been error. Dr. Hockett proposed identical instructions in this case but they were not given by the trial court.

The above "no guarantee" and "bad result" instructions state well nigh universally recognized principles of medical malpractice law.[12] While the above instruction, if given, would not have been error,[13] its language does not comport with modern practice in instructing juries. Current practice is

to avoid slanted or argumentative instructions. A jury instruction should be a statement of the law only. It is the function of argument by the lawyers to persuade the jury that the legal principle fits their version of the evidence or their theory of the case.[14]

---

[12]*See* 1 D. Louisell & H. Williams, *Medical Malpractice* 8–59 and accompanying cases at nn.30–32 (1986); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* 186 and cases cited at n.33 (5th ed. 1984).

[13]With regard to the "no guarantee" instruction, *see also Miller,* 11 Wn. App. at 279–80; *Creasey v. Hogan,* 48 Or. App. 683, 695–96, 617 P.2d 1377 (1980), *aff'd,* 292 Or. 154, 637 P.2d 114 (1981); *Fall v. White,* 449 N.E.2d 628 (Ind. Ct. App. 1983); *Lange v. Schultz,* 627 F.2d 122, 127 n.4 (8th Cir. 1980).

With regard to the "bad result" instruction, *see also Miller,* 11 Wn. App. at 279–80; *Shamburger v. Behrens,* 380 N.W.2d 659, 663–64 (S.D. 1986); *Hitch v. Hall,* 42 Md. App. 260, 268, 399 A.2d 953 (1979); *Dincau v. Tamayose,* 131 Cal. App. 3d 780, 800, 182 Cal. Rptr. 855 (1982); *Hunsaker v. Bozeman Deaconess Found.,* 179 Mont. 305, 328, 588 P.2d 493 (1978).

[14]Washington Pattern Jury Instructions, 6 Wash. Prac. VII (2d ed. 1980).

This instruction, when given in the future, should simply state the principles as follows:

A doctor does not guarantee a good medical result.

A poor medical result is not, in itself, evidence of any wrongdoing by the doctor.[15]

Published uniform jury instructions commonly contain instructions to this same general effect.[16] The instruction language set forth just above is based on the published New Mexico uniform instruction.[17] As the instructions for use of that instruction state, "in most cases, this instruction will be given".[18] Such an instruction is particularly appropriate where the jury has heard evidence or argument from which it might reach an improper conclusion that doctors guarantee good results or can be found negligent merely because of a bad result.[19] It would, of course, not be appropriate in a case tried on a theory that the doctor had promised a particular result.[20]

The "error of judgment" instruction unanimously upheld by this court in *Miller,* and also proposed by Dr. Hockett in this case, is also proper:

"A physician or surgeon is not liable for an *honest* error of judgment if, in arriving at that judgment, the physician or surgeon exercised reasonable care and skill, within the standard of care he was obliged to follow."

(Italics ours.) *Miller,* at 160 n.4. Henceforth, however, the

---

[15]*See* New Mexico Supreme Court, *Uniform Jury Instructions—Civil* 11.12, at 219 (1980 repl.).

[16]*See, e.g.,* 1 California Jury Instructions, Civil, BAJI 6.02, at 178 (7th ed. 1986); 3 Ohio Jury Instructions 331.01(3), at 183 (1984); 1 New York Pattern Jury Instructions—Civil, PJI 2:150, at 390 (2d ed. 1974); 1 Wisconsin Jury Instructions—Civil 1023 (1984).

[17]See footnote 15.

[18]See footnote 15.

[19]*See Dahlberg v. Ogle,* 268 Ind. 30, 38–39, 373 N.E.2d 159 (1978).

[20]See footnote 3.

italicized word "honest" should not be used in those cases where it is appropriate to give this instruction. This is because the use of the word "honest" imparts an argumentative aspect into the instruction which, as discussed above, does not coincide with current jury instruction practice. As the Virginia Supreme Court explained in *Teh Len Chu v. Fairfax Emergency Med. Assocs.*, 223 Va. 383, 386, 290 S.E.2d 820 (1982):

> Furthermore, we believe that terms such as "honest mistake" and "bona fide error" have no place in jury instructions dealing with negligence in medical malpractice cases. The terms not only defy rational definition but also tend to muddle the jury's understanding of the burden imposed upon a plaintiff in a malpractice action. If use of the terms were permitted, it would be appropriate to ask: Must a plaintiff prove a "dishonest mistake" or a "bad faith error" in order to recover? The obvious negative answer reveals the vice in the use of the terms.

The error in judgment principle is accepted in this state as *Miller* makes clear, and probably in a majority of other jurisdictions as well.[21]

This "error in judgment" instruction is, however, to be given with caution. In the first place, as its terms make clear, it applies only where there is evidence that in arriving at a judgment, "the physician or surgeon exercised reasonable care and skill, within the standard of care he [or she] was obliged to follow." Secondly, its application will ordinarily be limited to situations where the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses.[22]

We return to whence this discussion started, the standard of care of a doctor. As noted at the outset, at the time *Miller* was tried the doctor was required to meet "'the

---

[21]*See Ouellette v. Subak*, 391 N.W.2d 810, 814 (Minn. 1986). *See also* D. Louisell, *supra* at 8–58 and cases cited at n.29.

[22]*Spadaccini v. Dolan*, 63 A.D.2d 110, 120, 407 N.Y.S.2d 840 (1978). *See also Fall*, at 635–36; *Truan v. Smith*, 578 S.W.2d 73, 76, 100 A.L.R.3d 715 (Tenn. 1979).

standard and degree of care and skill expected of the *average* medical . . . practitioner, in the class to which defendant belongs, acting in the same or similar circumstances.'"[23] Subsequent thereto, the Legislature in 1975 enacted legislation dealing with the standard of care in professional malpractice cases.[24] Interpreting that 1975 legislation, this court in *Harris v. Groth*, 99 Wn.2d 438, 663 P.2d 113 (1983) concluded that the effect of that legislation was to change the standard of care to "that of a *reasonably prudent* practitioner possessing the degree of skill, care, and learning possessed by other members of the same profession in the state of Washington."[25] (Italics ours.) In short, the standard of care was thus changed by the Legislature from the standard "expected by the medical profession" to that "expected by society".[26] Under this new standard, the *degree of care actually practiced* by members of the profession continues to be relevant evidence of what is reasonably prudent, but is no longer necessarily dispositive of that issue.[27]

In the case before us, both the trial court and the Court of Appeals were of the view that the change in the standard of care, as enunciated in *Harris,* affected the instructions we had approved in *Miller.* This is incorrect. The "no guarantee", "bad result" and "error in judgment" instructions discussed above, to use the phraseology of *Miller,* "supplement" the standard of care; while they may clarify it, they do not change it. Thus, these instructions can only be given in connection with a proper standard of care

---

[23]See footnote 9.

[24]Laws of 1975, 2d Ex. Sess., ch. 56, § 9, codified as RCW 7.70.040; Laws of 1975, 1st Ex. Sess., ch. 35, § 1, codified as RCW 4.24.290.

[25]*Harris v. Groth,* 99 Wn.2d 438, 451, 663 P.2d 113 (1983).

[26]*See* Comment, 6 Wash. Prac. 32 (2d ed. supp. 1984); *Harris,* at 445.

[27]*Harris,* at 451.

instruction.[28] The instructions approved in *Miller* were not mentioned in *Harris* and are unaffected by it. The purpose served by these instructions, used in the manner and form approved herein, is best described by using the words of one commentator who, in discussing similar supplemental or clarifying instructions, stated that

> *these doctrines provide useful watchwords to remind judge and jury that medicine is an inexact science where the desired results cannot be guaranteed, and where professional judgment may reasonably differ as to what constitutes proper treatment.*

(Footnote omitted. Italics ours.)[29]

ISSUE TWO.

CONCLUSION. Based on the posture of this case at the time it was submitted to the jury, we conclude that the trial court did not commit prejudicial error by failing to give Dr. Hockett's proposed jury instructions on these three principles of law.

The question thus becomes whether the failure to give Dr. Hockett's proposed instructions was prejudicial error. We hold that it was not.

Factually, this case is quite unique for a medical malpractice case. In the posture in which the case went to the jury, the principal, if not the only, real liability issue for the jury to decide was as to who was telling the truth about the content of the patient's phone conversations with the defendant doctor between April 29, 1980, when the doctor examined him, and May 6, 1980, when the patient entered the hospital emergency room with an extensive rectal abscess. The following illustrative excerpts from the record make it eminently clear that as a practical matter this was the defendants' theory.

---

[28]*See Miller,* at 159; *Dinner v. Thorp,* 54 Wn.2d 90, 98, 338 P.2d 137 (1959).

[29]J. Perdue, *Texas Medical Malpractice,* ch. 2, "Standard of Care", 22 Hous. L. Rev. 47, 60 (1985). *See also* A. Holder, *Medical Malpractice Law* 44, 83 (1975); *Young v. United States,* 574 F. Supp. 571, 581 (D. Del. 1983); *Newell v. Corres,* 125 Ill. App. 3d 1087, 1094, 466 N.E.2d 1085 (1984); *Joy v. Chau,* 177 Ind. App. 29, 40, 377 N.E.2d 670 (1978); *Spadaccini,* at 120; *Downer v. Veilleux,* 322 A.2d 82, 87 (Me. 1974).

Beginning with his opening statement, Dr. Hockett's counsel took this view:

The real question is who is responsible for Mr. Watson not having treatment between April 29 and the night of May 6 when he went into Yakima Valley Memorial Hospital. Now, that's just really what this lawsuit boils down to; is this Dr. Hockett's fault or is this Mr. Watson's fault.

In concluding his opening statement, counsel further stated:

So in summary, you understand what our evidence is going to be. I would simply ask that you wait until you hear all of the evidence and hear both sides and then make up your mind as to what, in fact, caused the problem for which Mr. Watson presented himself in the emergency room on the night of the 6th; whether, in fact, it was Dr. Hockett's neglect or whether, in fact, it was Mr. Watson's failure to go see a physician or go to the emergency room as instructed to do.

Thank you.

Then in closing argument, counsel for Dr. Hockett further narrowed the issue:

Before I discuss specifically those issues, this case, I think more than almost any case that I can ever recall, involves really credibility. It involves really whether you believe one side's witness or the other side's witness. And as I will discuss with you, what it really boils down to is whether you believe Mr. Watson or Dr. Hockett. And I'm going to get into that in detail. But I want you to remember as I discuss these issues that the thing that I think is most important in this case is the credibility of the parties, the believability of the parties, whether what they said to you makes sense, whether the other evidence ties in and supports their version or not.

He also told the jury:

So let me move on and discuss with you the negligence and contributory negligence. And I think what we're really dealing with here is the question of delay. I believe [plaintiff's counsel] suggested that to you, and I agree with it because what we're really questioning here is was there any delay which cased damages. And I think the

answer is yes, there was, because I think we all can hear from all the testimony that had this been diagnosed on May 2nd, or perhaps the 4th or the 5th, somewhere along in there, that the chances are that the damages would have been lesser perhaps, you know, almost none. So the real question is what caused the delay. And obviously you get down to really basically two choices, either the delay was caused by the actions of the Defendant Dr. Hockett or the delay was caused by the actions of the plaintiff.

Dr. Hockett's counsel further argued:

Well, so where does that, I guess, bring us? I suggested to you that the real issue in determining negligence, in determining whether you believed Dr. Hockett's version or you believed Mr. Watson's version, was credibility.

Then counsel for the Clinic similarly argued to this same effect in closing argument:

It is, as [Dr. Hockett's counsel] has indicated to you, really an issue in about three days of time because on April 29, no one says that Dr. Hockett failed in his responsibilities in failing to diagnose rectal abscess. No one says that. The only thing you're talking about here is whether you accept Mr. Watson's testimony that he is calling and calling and telling Dr. Hockett I'm getting worse, I'm having more pain, and Dr. Hockett is telling him No, just forget it, you just do what I told you.

Thus, counsel for the defendants made a tactical decision from the outset, and certainly it was a reasonable one under the circumstances, that the determinative liability issue in this case was as to who was to be believed concerning the content of the phone conversations, doctor or patient. This having been defendants' theory through closing argument, we fail to see any prejudice to the doctor or the Clinic in the trial court's failure to give the customary "no guarantee" and "bad result" instructions or in not giving the "error in judgment" instruction.

Although we reach the same result as the Court of Appeals so far as affirming the trial court is concerned, the decision of the Court of Appeals with respect to the proposed instructions discussed herein is reversed insofar as it is inconsistent with this opinion.

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.